Page number 18 of the 10-01-L Calumga Medical Ctr. at Ithaca, Inc. The table of the 10-01-L Calumga Medical Ctr. at Ithaca, Inc. is now in session. Good morning. May it please the Court, my name is Tyler Henry, Counsel for Petitioner-Cross-Respondent at Culuga Medical Ctr. at Ithaca. Petitioner challenges the Board's findings on a number of unfair labor practice charges in this case, so I will address each of these charges as briefly as I can. The first unfair labor practice is a violation for two emails from CMC Vice President of Human Resources, Alan Peterson, indicating that if employees felt harassed or intimidated, they should feel free to contact management. The language used in these emails is consistent with longstanding Board precedent, specifically in Ithaca Industries and for students cited in our case. So the General Counsel and the Board, they attempt to distinguish Ithaca Industries by arguing that in that case, the employer did not say, report if you feel intimidated, but instead it just said, report if you are intimidated. And I submit there's not a meaningful difference between those two formulations. It should not matter whether employees feel or are actually intimidated. They should feel free to complain to their employer. Isn't the problem with the use of the word harass? I mean, that's a very broad term. And there is a point in the ALJ's decision where they say, ALJ doesn't cite any cases that states that reporting harassment has been categorically rejected as overbroad by Board precedent. The issue is if you look closely at those cases, NEWOC, WF Hall printing, the real issue in those cases was the word pressure, not the word harass. So the formulation was that if employees felt pressured. I thought the real distinction that was meaningful to me is that when the Board in the past has forbidden such solicitations of complaints, it's been approved when such solicitations of complaints were approved when what was going on was physical coercion or physical harm, but not something so broad as harass. Intimidation is one, and that doesn't necessarily mean physical intimidation. Employees can feel to be intimidated. And as Chairman Miskimer and his dissent indicated, all employees under Title VII are encouraged to report harassment. Harassment is unlawful under the law. This isn't a Title VII case. Title VII harassment means something very specific in a legal context. The phrase here, harass, seems to me to be quite broad and can cover a lot of activity. So, I mean, the word intimidated similarly would seem to be able to cover a broad array of materials. But wasn't the problem that the ALJ focused on and the Board focused on was that that statement was made immediately after statements about, you know, you may be pressured or asked to sign union cards, et cetera. So this statement about, you know, if you feel harassed, report it to us, was specifically in this context of, if you get a request to sign a union card that's unwanted that you feel is harassment, then report it to us. But that goes beyond what employers are allowed to do, right? So that was part of the formulation of the ALJ's decision. But if you look at the first student and Ithaca industry cases, those both involved union activity. They both involved solicitation. The first, Ithaca Industries, involved solicitation of union authorization cards here. Can I ask you about the second email? Because that was in response to an employee who said, I have floated to another unit and feel like I'm being harassed and pressured to sign a card. What can I do? And as I understand your argument, you took that to mean that she floated to, the language floated to another unit that she was being approached about the union in a patient area, which is, of course, not allowed. And you do say, it is not legal for you to be solicited while you're in a patient care area performing your job. Correct. Is that your position with respect to the second? Correct. That's part one of the position for the second issue. And also, we clearly used the term harassed in the response to the question. So we don't use the word again. The unlawful formulation of the word pressure in every case where pressure is included with the word harass. Was that argument made in your exceptions? Say that again. Was that argument made in your exceptions? The exceptions, I am not misstating the case. Yes. Well, it's not specifically word for word stated in the exceptions. But, again, the 10E under the Act doesn't require that every single statement needs to be spelled out and articulated in the complaint. Our basic position in the exceptions was that this was a lawful statement under the formulas of the board law. And that's encapsulated. This argument that I'm stating here that's articulated falls within that 10E groundwork. Well, you did make the argument that what you responded to was a correct statement of the law. That if you're approached about unionization while you're doing your job as a nurse, specifically and especially, you have a perfect right and really are expected to say, this is verboten, you can't do this. Exactly. Okay. So that's issue number one. Move on to the next unfair labor practice at issue involves an alleged statement that discussing wages was inappropriate.  First, there's no way to determine here whether the violation even occurred within the statute of limitations. Because the only witness that testified to the statement occurred, could not name even a year that the alleged violation occurred in. In addition to being unable to name the year the conversation occurred in, the witness also did not name the other nurses involved, state whether the nurses were on working time, which goes to that first question that they can't be solicited on working time, and provided no clear context for what exactly Peterson was referring to as being inappropriate. So this in combination is insufficient to establish substantial evidence of a violation. I thought a heavy component of the board's determination there was a decision, there was a credibility determination about Marshall. They just believed Marshall and didn't believe Mannington. And I would argue I understand the credibility determination. We're in that area. And I would argue. Sorry. We're in the credibility area. That's really hard for us to overturn board findings. So I would argue that we're not in a credibility determination area. We're in a substantial evidence standard area. If you look at the facts in the case, there's not enough there to establish substantial evidence. Again, we don't have, we have no idea when the statement occurred, the context of the discussion, what exactly what was said. Wasn't there an informal policy that you're not supposed to talk about wages? And here Marshall says she's told that? What's implied by that? So there's a dispute in the record over whether there is a general policy not to discuss wages. And what the board does is it takes a letter from 2011 to say that you shouldn't talk about a new salary wage increase to then take the speculative leap that in 2015 on the rounds that Peterson may have made this statement to four nurses that are not named. And I think the biggest issue here, too, is that the ALJ and football. But did Peterson even deny that he made the statement or did he say I don't recall? He said I don't recall ever having made a statement like this ever in making my rounds is what he said. And in the case, the ALJ puts the responsibility on the employer for not finding a witness to disprove this allegation, which is inappropriate here. Because, again, disproving a negative when we don't even know what year the statement occurred in. We don't know what other nurses were allegedly involved in this. It's impossible for the employer to try to disprove this, which just highlights further that the board didn't meet the substantial evidence standard here. If we can't even go about finding a way to disprove it, then there's not substantial evidence here to meet the burden for an unfair labor practice. So that's number two. Moving on to the next unfair labor practice. This involves Scott Marsland, who was given a verbal warning for his conduct at the staff meeting. At the staff meeting, despite being asked at least three times by his supervisor to stop and that this was not the appropriate forum for this discussion, Mr. Marsland called one nurse incompetent and said another registered nurse was basically like a nursing student. Again, this was all in front of a large group of co-workers and providers, all of whom were required to provide. Remind me, what was the purpose of that meeting? Why was it convened? Just to discuss general concerns among the staff. That was the purpose of the meeting. Wasn't the specific agenda item about coverage on lunch breaks? In the beginning of the meeting, yes. Was staffing, you know, in order for nurses to be able to take lunch, somebody would have to cover for them, and so then the question was is there enough staffing to cover for people and who are the staff that are going to be used to cover for people? The agenda item wasn't as specific as that point, but staffing was one of the issues to be discussed. It was general in a lot of these roundup meetings that the employer had. And again, so there's no dispute that it did start in the context of a staffing discussion, which is in the protected realm. But the fact that three times this employee was asked to stop when the supervisor realized he was going to the area of calling somebody incompetent, calling two separate nurses incompetent, that goes to insubordination. And the board in the general counsel's primary contention is that the conduct should not lose the general protection under the act, because the employee did not swear or yell. But again, we contend in our briefing here that this should not be the only consideration in this analysis. One coworker telling supervisors in a group of employees altogether that a coworker is incompetent is a defamatory statement, and I submit has a far more devastating impact than simply someone swearing or raising one's voice. So here, again, in total, when you look at the Atlantic Steel factors, Mr. Marsland persisted in an insubordinate fashion to make these personal attacks for all of his coworkers to hear, and it falls outside of the protection of the act. Now, there are a number of disciplinary events involving an employee and Marshall. CMC contends that each of these actions would have been taken regardless of whether Mr. Marshall was involved in the union campaign, and therefore there's no violation. First, again, I'll do these very briefly. Let me just sort of put them all together. Isn't it a little suspicious that all of a sudden their misconduct occurs right during the union organizing, that she was a model employee, but what's the management's theory? All of a sudden getting caught up in this union activity, all of a sudden she has all these reprimands, and this is fun action. I don't think it's for us to predict what was going on in Marshall's head other than, I mean, her outward behavior changed, so the employer had to react to that. For example, the June 26 suspension, where she provides all of these different excuses to different supervisors and different stories about whether she made calls to fill an emergency staffing situation, the employer has a right to question that when, again, the board and the general counsel. ALJ believed her and didn't believe your client. In terms of, again, it goes to the substantial evidence issue of the board. So what the ALJ did is it unfairly accused the employer of not getting to the bottom of these inconsistencies in Marshall's story. Sorry, in the employer's version of events, the inconsistencies. The issue is, if you look at the evidence, is all the inconsistencies come from Marshall's version of events. She tells different people different things about what she did. When asked for a list of employees to provide a list of employees that she allegedly called, she refuses to provide that list of employees. She told one supervisor she didn't call. So the employer had enough evidence there to discipline Marshall without going through those inconsistencies, because the only inconsistencies that were created were created by Marshall and what she told the supervisors. Again, so that Marshall, I won't belabor the point. You have the briefing on our position on the verbal warning and the demotion as well, and I'll leave the Marshall with that. The one final and Marshall allegation that I will address, which is a little bit separate and apart, is that she was unlawfully interrogated about union activity. And, again, this goes to substantial evidence. This is a question of substantial evidence as opposed to a credibility determination. So if you look at the record, Ms. Marshall never stated what was exactly said in that meeting. The actual transcript of the hearing, she provided her own characterization, stating that Joel Brown basically said that Marshall was the ringleader, and if she didn't stop, he was going to get HR involved. So, again- Did Brown testify? Hm? Did Brown testify? Yes, Mr. Brown testified and denied to believe that he ever used the word ringleader or that he ever mentioned the word HR. So, again, what we have is Marshall's- And Marshall, so she never said that he actually said these things. And didn't ALJ find that he was not credible? As to this point, I do not believe that he found Brown not to be credible. He was found not to be credible on another point, I guess, when he said that he wasn't really concerned about union activity when that was contradicted by numerous emails and correspondence. Wasn't that him? That was a statement, yes. But, again, here, so rather than a credibility determination, we have Marshall never actually testifying what was actually said in that meeting. It's her characterization of what was said in that meeting. And we went over an area of law earlier where the distinctions in language are razor-sharp, razor-thin here in terms of what's a lawful statement and what's an unlawful statement. And where somebody characterizes what was basically said in a meeting, this shouldn't be enough to establish substantial evidence of the position. Florence Ogundeli, these are the Facebook posting threats. Two threats claimed to have been made by Supervisor Florence Ogundeli. The first, she, again, Florence says that she's responding to a religious accusation that she sold her soul to the devil. She's very passionate about her religion. And she responded that she would not be bullied and intimidated and advised the poster, Scott Marsden, not to mess with her and that his disciples should do the same. Again, there's no specific mention of the union in that post. And Florence stated there were posts about her religion that were no longer available at the hearing that she was referring to. So that's the first. There was no specific reference to union activity, and it was a response by Florence to an offensive statement. As for the second posting, recognizing that the statements therein are likely unlawful, there's no evidence in the record that any employee at CMC actually saw the posting. It was only up for two hours. So our contention is this would be equivalent to a supervisor yelling a threat into an empty hospital. And the last point here, very briefly, goes to distributing union literature. First, CMC admits that Alan Peterson mistakenly told two employees they could not put a table display out in the cafeteria. That happened. However, after seeking further legal guidance, no additional comments were made. No one was ever disciplined, and there was no further action or discussions. So CMC contends that this two-time error, so it occurred two times, is consistent with the board's decision in Kendall Co. where there was a disparate enforcement of a policy in that it was not shown to be unlawful based on isolated deviations. So our position is that CMC slipped up in its policy enforcement, and just as if United Way was to come in and set up a table, we should have allowed that table to be set up, and that this two-time violation of that policy was a disparate enforcement, but does not rise to the level of an unfair labor practice. And then the last union literature area, the board found that the employer took down certain pro-union materials from areas in the hospital. However, CMC did have a general practice of removing non-business-related material from certain areas in the hospital, certainly not all areas of the hospital. And again, going to the substantial evidence portion and not the credibility factor, there's insufficient evidence of a violation because neither the ALJ nor general counsel nor board is specific on which locations managers and supervisors allegedly removed the materials or when these violations occurred or what the materials actually were. So once again, there's a substantial evidence issue that was not met here. All right. You've gone over your time. I do want to ask you, was there ever an election? There was never an election, no. All right. We'll give you a minute to reply. I appreciate it. Thank you. Ms. Isbell? Good morning. May it please the Court, Kelly Isbell here on behalf of the National Labor Relations Board. When the nurses at Cayuga Medical Center started trying to organize a union, the managers started a campaign of their own. They interrogated and threatened employees. They removed union literature, prohibited employees from distributing literature in the cafeteria, and targeted the two employees they saw as the primary pro-union employees. Scott Marsland was engaging in protected conservative activity, and they disciplined him. Anne Marshall, the ringleader of the union campaign, was targeted with suspensions and warnings, eventual demotion, and a bad evaluation. Cayuga's challenges to the Board's decision are primarily based on factual disputes and credibility. And as you know, the Court won't overturn our credibility determinations unless they're close enough. What about the e-mails? What about the two e-mails? The two e-mails? Yes. Those e-mails, when the Board – the Board explained it first student, that when it's deciding whether or not e-mails like that are unlawful, it looks at the actual context of the letter. And this letter, both of them – I mean, there were several e-mails that Peterson sent out, but there were only two the Board found had unlawful language in them. The first one said, you are going to be asked or more likely pressured to sign a card, and then later says, if you feel harassed, report it to us. So it's equating being asked or pressured to sign a card with feeling harassed. The next letter had the same kind of language. I'm feeling harassed or pressured to sign a card. What should I do? You should report that to us. And this is the same kind of language the Board found to be unlawful in Bloomington Normal and Niblack Engraving. But didn't one of the e-mails use the word harassed or intimidated? Yes, it did, Your Honor. Does that make a difference? The Board has found the use of the word intimidation to be lawful in certain contexts. But in this context, because the letters themselves equate being pressured to sign a card with harassment or intimidation, the Board found it to be unlawful. I mean, there's the Ithaca Industries – I had a first student at Ithaca Industries where the lawful language said, if you are confronted and harassed or intimidated. So the employer was equating a physical confrontation with threats and intimidation. And the Board found that to be lawful. But here we have an equation of asking someone repeatedly, which can be annoying, to sign a card with feelings of harassment or intimidation. But it's also not – it's beyond annoying. It's not allowed in a patient area. And that's what they were saying. Well, Your Honor, I don't read that letter that way. I mean, the letter says – It says, it is not legal for you to be solicited while you're in a patient care area and performing your job. And that is an absolutely legal thing to say. That's not what the Board found to be unlawful. Supporting feelings of harassment is what the Board found to be unlawful. If you feel that you continue to be harassed and continue, relates back to being solicited in the patient care area. I don't remember any arguments below about this actually being about solicitation in the patient care areas. Well, that's what the e-mail says. Well, what the Board found unlawful was the request of reports of people who are soliciting you and pressuring you to sign a card. But there isn't any – In the patient area. There isn't any evidence that anyone was solicited in the patient care area. That was not the focus of the Board's – That was not what was presented to the Board. These people are doing this unlawfully in a patient care area. So this third question that the Board – I mean, that the hospital's responding to, from a nurse, I have floated to another unit, feel I'm being harassed and pressured to sign a card. What can I do? You're saying that they just made out – that this relates to solicitation in the patient care area? Well, I don't have any – If that's the case, then it wasn't responsive to the question, and they were answering three questions. Well, I don't have – there is nothing on this record where they presented evidence that what they were actually concerned about was solicitation in the patient care areas. The e-mail itself says that's what the hospital was concerned about. But that is not the argument before the Board. The argument before the Board was just about solicitation in general. And, I mean, the Board is not saying here that you can solicit in a patient care area on work time. That, of course, is not Board law. All the Board is saying is that you can't ask for reports – for people to report union solicitors if you feel harassed or threatened. All right, let me ask you then, with respect to the answer to this third question, which states, as you've said, states the law, when could the hospital give that advice lawfully? Do you mind if I pull it up? Yeah. Can you tell me which page you're on, please, ma'am? JA 249. 249, okay. I just want to make sure that I don't say something. Okay, you have the right to tell. You do have the right to tell. Okay. So it is a legal statement to say it's not legal for you to be solicited while you're in a patient care area  All right. This is answering a question. The hospital is answering the question of some unknown nurse that I floated to another unit, and I assume the hospital takes that – I don't know what that means, but takes that to mean while I'm in this unit performing patient care, I'm being solicited. And admittedly, this was not before the Board, so the Board did not talk about this, but floated to another unit to me means I am now working in another work area. So instead of – Working, taking care of patients. Well, I am now – instead of being in ICU, this shift is in I'm in emergency because they have a staffing problem. But that doesn't mean that this is – the solicitation has happened – Why would that be pertinent to the question unless she were working? She said, you know, I'm now doing such and such, and I'd like to know the answer to something that has nothing to do with how I'm working at such and such. Right. And I just don't read it as while I am working. I read it as I am now with unfamiliar people, and I feel like I'm pressed. But the hospital did. But the hospital did. And there's nothing illegal about the hospital telling that nurse, you cannot be solicited while you're performing your job, and you can tell them to leave you alone. And if they – if you continue to be harassed, meaning while you're working, according to the hospital, you can come see us. And I just don't – that particular formulation was not how it was argued to the Board, and that is not part of the Board's decision. So the Board is only – is not looking at business of patient care. But you agree that if it were – if it were, that there's nothing unlawful about the employer saying, come tell us if you're being harassed in a patient care area by somebody trying to pressure you to sign a union card. If that – if those were the facts, that would be different. And that is actually the rule, and it's not being – you know, then we get into it's not being disparately applied. Exactly. But as a statement of the law, you – the Board would certainly say, as a, you know, straight-out statement of the law, you can prevent people from soliciting the inpatient care areas on work time. Your argument, I take it, is that that – you don't – that that's not the only reading that's compelled by the e-mail. And that you're also saying that was not argued before the Board. Yes, Your Honor. Okay. So do you have any more questions about the e-mails? No. Okay. I did want to talk about Ms. Marshall just for a minute. And talk about the inconsistencies in the facts related to her suspension. The inconsistencies were not provided by Ms. Marshall. Ms. Marshall always told Linda Crum, the person who suspended her, that she never said she did not call people. She always said that she made calls, which she had to do, as you know on this record, all the time. All the charge nurses and team leaders were routinely having to call to fill the holes in the schedule. Where the inconsistencies come in are with the managers. So there are two different managers who say that she told me she called people and nobody's coming in. There are other managers who say she told me she did not make any phone calls. So as I read this record, the inconsistencies are with management. She always denied making those statements. But the bigger issue is that the ALJ just found that they didn't meet their right-line burden. You have to show that you would have had to take this action even in the absence of her union activity. You would have taken the same action. And the ALJ found they did not make that showing. The comparator evidence they put on shows that they typically go through their usual progressive discipline process. There's evidence of people being rude and profane and yelling and throwing charts. And those people all got multiple counselings and prior warnings and individual improvement plans before being suspended. The verbal warning related to the incident with Mr. Brown is a credibility determination. Of course, the ALJ believed Ms. Marshall, not Mr. Brown. And I don't think there's been any showing that her testimony was hopelessly incredible. I mean, what's shown in the record is Ms. Crum doing an investigation where she turned in to the administrative law judge instead of typed notes that didn't actually reflect the handwritten notes that were later found to be in her car. And the administrative law judge found that her investigation and the notes she presented to him originally did not reflect what the actual investigation showed, which was that no nurses heard any kind of confrontation between Mr. Brown and Ms. Marshall. They only heard Ms. Marshall and him talking about the schedule, but they did not hear what Mr. Brown said. They did not hear anything that corroborated his story that would justify a verbal warning. We didn't talk about the demotion, but I think on this record the ALJ's findings are completely valid. Where she went from the managers initially said she was flippant, and that changed before she was demoted into her making an obscene gesture. And there's no evidence that she actually made the obscene gesture, but there is testimony about her being flippant, and there are emails that say she was flippant, and then suddenly she's demoted for obscene gestures. And there's just not enough evidence to justify a demotion on that basis. This was an exemplary employee for years with very good evaluations and no discipline until the union campaign started, and then suddenly she has a bad attitude and is being targeted with multiple disciplines in just a few months. Does the court have any questions about Ms. Marshall? How about Mr. Marjolin's insubordination? With Mr. Marjolin, he was engaged in protected concerted activity. This was a staff meeting where the manager expected people to provide feedback and to talk about issues. Even so, that doesn't justify insubordination. Well, the manager herself – Well, it does? Under the board's rules, even if he engaged in insubordination, his activities or his discussion that morning were part and parcel of this protected concerted activity, and for it to lose the protection of the act, he would have to do something egregious. What he did was talk about an issue that the nurses had talked about, that the nurses had raised to other managers, and he did not bring up those two nurses' names. The manager first said, thank you all for taking breaks, and I especially want to mention these two managers. And at that point, he felt like he needed to say, in a staff meeting where these discussing common problems was expected, that he himself had refused to take breaks because he didn't feel like his critical care patients were safe, and he needed to bring it to this manager's attention. This was a common problem other nurses had had, and another nurse testified that she herself had brought it to a manager, about these particular nurses. This was not him saying things that were unknown or saying things that were unrelated to the terms and conditions of the hospital. The manager made the judgment that to bring that up in that sort of setting was going to cause all sorts of negative repercussions, which is easy to imagine, right? Why couldn't Mr. Barzunz have just gone privately, and it was the public nature of the claims that was the cause for concern. A manager isn't allowed to do that, to say, you know, we can talk privately about this, but this isn't the time or the place to say the things that you're saying. What's wrong with that? Well, I think just on this record, because this particular issue had been talked about so much and was so important to them, I mean, this was about the safety of patients. I thought it was the naming of the people that was the cause of the concern, not the discussion of the topic. It was on the agenda, right? It was on the agenda, right. Remember, the manager named those two people first, so Scott Marzunz only responded to her. She brought their names up, so their names were out there. And I think just because on this record there was evidence that those two particular nurses had been discussed among the other critical care nurses before, that this was something that was very important to them, and that was the kind of conversation that should happen at the staff meeting, when you're discussing whether or not you can take breaks. Okay, why don't you take a minute, and I want to take a minute, but I want you to point me to where you made the argument before the board, if you did, that I went over at great length with Ms. Isbell about the second e-mail being responsive. Did the hospital argue that the second e-mail was responsive to a nurse who was complaining about being approached while she was working? I reviewed the record, and we did not specifically make that complaint. We did not articulate that before the board. Again, the argument would be that it's encapsulated within the general complaint. It's not specifically articulated before the board. Just very, very briefly for Ms. Marshall, I'll notice for Joel Brown, the Joel Brown incident, which resulted in a verbal warning, there was no witnesses, and primarily because the bulk of the incident was in Joel Brown's office, so no one was around during that time. So to say that there was no witnesses is an inaccurate statement of the incident. And then I would also just mention that the issues for Mr. Marshall and the issues with these two nurses, this was completely unknown to the manager at that time. There was no complaints that were ever made to the manager. She never knew about this incident. Did the manager give him the option of talking about the issues privately? Yes, and there was, in the subsequent disciplinary meeting, which is a very late meeting. I'm saying at the meeting. I just can't remember the record. At the meeting, did the manager say, let's not talk about this here, let's talk about this privately? She said, let's not talk about this here, this isn't appropriate here, is what the manager said. But there was no indication that he would not be able to articulate this. And staffing was a regular conversation amongst employees. And that's my time. Thank you, Your Honor. We have your item.
judges: Henderson, Griffith, Wilkins